IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                               :
GARY L. STOLINSKI,             :      HON. JEROME B. SIMANDLE
                               :
              Plaintiff,       :      Civil No. 07-3174 (JBS/AMD)
                               :
       v.                      :
                               :           OPINION
SGT. JAY PENNYPACKER, ET AL.,  :
                               :
              Defendants.      :
                               :
```

APPEARANCES:

Kevin P. McCann, Esq.
Philip Anthony Davolos, Esq.
Shirley Ann Naylor, Esq.
CHANCE & MCCANN
201 West Commerce St.
Bridgeton, NJ 08302
        Counsel for Plaintiff

Francis P. Maneri, Esq.
Jordan M. Rand , Esq.
DILWORTH PAXSON, LLP
1500 Market Street
Suite 3500e
Philadelphia, PA 19102-2101
        -and-
Vincent J. Rizzo , Jr., Esq.
OFFICE OF THE NJ ATTORNEY GENERAL
RJ Hughes Justice Complex
25 Market Street
PO Box 112
Trenton, NJ 08625-0112
        Counsel for Defendant Pennypacker

Robert J. Hagerty, Esq.
CAPEHART & SCATCHARD, PA
Laurel Corporate Center
8000 Midlantic Drive - Suite 300
CS 5016
Mount Laurel, NJ 08054
        Counsel for Defendants Hurley and Koshland

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

   Plaintiff Gary L. Stolinski is a Sergeant with the New Jersey State Police.  On July 15, 2005, a New Jersey state grand jury indicted him on three criminal counts relating to his entering false information on credit card applications.  One count of the indictment was based on Stolinski having obtained the social security number of an Arizona resident to commit identity theft.  The charges against Stolinski were ultimately dismissed by the prosecutor when she discovered that, with respect to the identity theft charge, Stolinski had not obtained personal information from the Arizona resident; instead he had entered his business's tax ID in the application's space for a social security number, which tax ID is coincidentally identical to the Arizona resident's social security number.

   Plaintiff filed this action for malicious prosecution, among other claims, against the State of New Jersey, the New Jersey State Police Office of Professional Standards, and four individual state police officers, alleging that Defendants violated his rights under the United States Constitution and New Jersey law.  Having previously dismissed some of the claims and the institutional defendants [Docket Item 34],[1] the matter is now

---

        [1]  The Court previously dismissed the claims against the State of New Jersey, the Office of Professional Standards, Sgt.

2

before the Court on motions for summary judgment filed by the remaining individual Defendants: the lead police investigator, Defendant Pennypacker [Docket Item 97], and his supervisors, Defendants Hurley and Koshland [Docket Item 95].  Defendants have also jointly filed a motion to strike Plaintiff's expert report [Docket Item 93].

The principal issue to be decided is whether New Jersey law permits recovery for malicious prosecution for an individual charged in a multi-count indictment for which probable cause was lacking for a charge that carried a lower maximum penalty than at least one of the charges for which probable cause was present.

For the reasons explained below, the Court will grant Defendants' motions for summary judgment as to all claims, which moots the motion to strike the expert report.


## II.  BACKGROUND

### A.  Mount Laurel Police Department Investigation

On August 11, 2004, an individual living in Arizona, known herein as LG, filed a police report with the Flagstaff Police Department stating that American Express had informed him that someone in Mt. Laurel, New Jersey was using his personal

---

William Rudderow, and the individual Defendants in their official capacities.  [Docket Item 34.]  The Court also dismissed all claims except for the § 1983 false arrest claim, § 1983 conspiracy claim, state law malicious prosecution and abuse of process claims, and invasion of privacy claims.

information in an attempt to obtain a credit card.  (Pl.'s Ex. B-4, Flagstaff Police Report, JP2801-2802.)[2]  On the same day, LG also contacted the Mount Laurel police department.  (Pl.'s Ex. B-3, Statement of Det. Pincus, March 15, 2005, JP2580-2588, at JP2582.)

After a brief investigation, on September 20, 2004, Detective Edward Pincus went to the address listed on the credit applications and interviewed the man living there, who turned out to be Plaintiff, Mr. Stolinski.  (Id. at JP2583.)  When Det. Pincus advised Stolinski that he was investigating identity theft, Stolinski identified himself and informed Det. Pincus that he was a State Trooper.  (Id. at JP2584.)  Mr. Stolinski told Det. Pincus that he had put the tax ID number of his business, GS Tickets, in the space for the social security number by mistake. At that time, the other errors on the application, including an incorrect date of birth and misspelled name, were not discussed. (Id.; Ex. B-4, Reportable Incident Form 2004-0805, JP2797-2798.)

As it turns out, Plaintiff's tax ID number is numerically identical to the social security number of the Arizona resident. In the investigation that followed, the principal investigator failed to verify this exculpatory fact.  As explained below, this failure, along with false grand jury testimony about the tax ID,

---

[2]  The Court's references to items by JP number refer to the Bates-stamped documents produced in discovery and provided by the parties for this motion.

resulted in Stolinski being charged with identity theft in addition to other charges related to credit card fraud.

### B.  Pennypacker's Investigation for the State Police

On September 21, 2004, Detective Sergeant William Rudderow of the Mt. Laurel Police Department contacted Defendant Daniel Hurley at the New Jersey State Police, Office of Professional Standards, and advised Hurley of the status of the case involving Stolinski.  (Mt. Laurel Police Report at JP01419.)  Though initially assigned to Acting Detective Sergeant John McNally, at some point between December 2004 and January 6, 2005, the investigation was transferred on the order of Defendant Bradford Koshland to Koshland's Unit, and Koshland assigned Defendant Pennypacker to investigate.  (Koshland Dep. 65:7-13, 68:24-69:1; Pennypacker Dep. 30:13-31:2.)

Some of the details of Pennypacker's investigation are disputed or unclear.  But key facts are undisputed.  First, Pennypacker learned that Stolinski submitted at least ten credit card applications between May 16, 2004 and September 1, 2004 which contained incorrect and conflicting information.  Stolinski admits that he filled out more than ten credit applications (Stolinski Dep. 60:21-22), and that he made a substantial number of errors with respect to his name and his date of birth.  (Id.

65:2-10, 69:10-15, 70:23-71:15.)[3]   Although Stolinski disputes
the intentionality of any of the errors, it is undisputed that
Stolinski submitted applications with transposed numbers in his
tax ID and social security number, transposed digits in his own
birthday, and incorrect variations on his name.  According to the
evidence relied upon by the police, he also identified GS Tickets
as being structured variously as a corporation, a partnership, or
a sole proprietorship, stated different amounts of business
revenue, and entered his business's tax ID number where a social
security number was to be entered.

It is also undisputed that GS Tickets, the business whose
tax ID is at the center of this case, exists on paper.  But GS
Tickets never did any business.  It is a sole proprietorship that
never generated any revenue.  (Stolinski Dep. 11:5-7, 12:24-
13:6.)  Despite being named GS Tickets, according to Stolinski,
it was "supposed to sell individual items, nothing specific, you
know, household items, whatever it was. . . . [J]ust basically

---

[3]   The parties squabble over thirty-seven print-outs
described as credit applications submitted by Stolinski in
Pennypacker's Statement of Undisputed Material Facts, and
summarized in a chart by his counsel at Pennypacker's Exhibit E.
Plaintiff argues that Defendants have not produced any witnesses
who can authenticate the records, and therefore they should not
be considered for this motion.  But the documents are not being
submitted to show the truth of their content, but rather to show
what information the police investigators relied on.  And even if
these documents are ignored, they are not necessary to establish
the undisputed fact that Plaintiff submitted multiple
applications containing false information.

anything, you know, buy and sell, eBay stuff, that kind of stuff, nothing specific. . . . to sell things through the internet or to, you know, friends, other persons, nothing specific." (Id. 9:13-25.)  GS Tickets never bought or sold any item, and had no website.  (Id. 10:11-11:2.)

Finally, it is undisputed that Pennypacker was aware of the fact that Stolinski was substantially indebted (in the amount of approximately $53,000 excluding his home mortgage) and was behind on his payments by thousands of dollars when he was submitting these multiple erroneous credit applications.  (Ex. B-6, OPS Memorandum, JP 4667.)  Mr. Stolinski filed for bankruptcy on December 3, 2004, though it is unclear when Pennypacker learned this.  (Pl.'s Ex. B-6, Chapter 13 Plan, JP3817.)

The key material dispute regarding Pennypacker's investigation is over his purported effort to verify Stolinski's story regarding the tax ID number.  In mid-April 2005, Pennypacker filed a financial query (a so-called FinCEN Query) with the State Police Official Corruption Unit, in what he now describes as an effort to determine whether GS Tickets had actually been assigned a tax ID number matching LG's social security number.  (Pl.'s Ex. B-2, Investigation Report, JP2525-26.)  Pennypacker testified that this request "would let [him] know or vet the fact that the number was issued or valid as a Tax ID number," and that he "felt that through sending in that FinCEN

request and the return replies that I got, that that information
to me meant that there was no tax ID number." (Pennypacker Dep.
69:7-11, 84:1-12.)

Plaintiff maintains that Pennypacker knew that a FinCEN
Query would not verify the validity of the tax ID.  No part of
the request form indicates that it seeks to verify the tax
number, and the report that the request generated makes no
mention of the tax ID.  The only plausibly relevant statement on
the report is that "A check of D&B's public records database
indicates that no filings were found for GS Tickets," but the
next paragraph states that the database includes "business-
related suits, liens, judgments, bankruptcies, UCC financing
statements and business registrations from every state and the
District of Columbia."  (Investigation Report at JP 2595.)
Pennypacker's contemporaneous discussion of the FinCEN report in
his Investigative Report is somewhat brief, and does not note the
presumably important finding he believed he made from the report
that the tax ID allegedly used by GS Tickets did not exist.
During his investigation, Pennypacker never contacted the IRS to
determine whether or not there was a federal tax ID for GS
Tickets (Pennypacker Dep. 69:1-11.)  Pennypacker also never
interviewed Stolinski for his investigation.  He e-mailed Captain
Daniel Hurley for permission to do so, but permission was denied
because "it appear[ed] that the evidence [was] overwhelming and

8

there [was] little the Trooper could add to a statement to assist his cause."  (Pennypacker Dep. 88:5-89:8.)

### C.  Drafting of Indictment

On May 13, 2005, Pennypacker met with Deputy Attorney General Susan Kase.[4]  Three days later, apparently having reviewed Pennypacker's Investigation Report, DAG Kase proposed an indictment which included charges for credit card fraud and official misconduct as well as a charge for identity theft, which requires the accused to have obtained the personal information of another.  See N.J. Stat. Ann. § 2C:21-17a(4).  Plaintiff maintains that DAG Kase and Pennypacker collaborated on the drafting of the prosecution memo and indictment, but there is no evidence that Pennypacker did anything more than review the documents.  (Defs.' Ex. A-1, Memorandum of May 16, 2005, JP00036; Defs.' Ex. A-1, Memorandum of June 29, 2005, JP00088; Pennypacker Dep. 128:7-21.)  The six-page prosecution memo discusses use of a "false social security number," among other false information, but does not state that this number was obtained from LG.  (Ex. B-1, Prosecution Memorandum of July 8, 2005, JP00129-JP00134.) The memo reports Stolinski as claiming that there was a "misunderstanding" regarding the tax ID number but does not state

---

[4]  Evidence regarding what information was exchanged between the two is purportedly found on JP2534, but that part of the document as submitted to this Court is obscured.

whether the number was in fact the tax ID number of GS Tickets,
and does not discuss how the prosecution theorizes that Stolinski
was able to obtain the social security number from LG.  (<u>Id.</u>)
Nevertheless, the memo proposed an identity theft charge.


### D.  Arrest

Pennypacker delivered a target letter to Stolinski, but did
not arrest him.  (Pennypacker Dep. 87:14-88:4.)  Stolinski was
subsequently required to be "processed" by the New Jersey State
Police, which included a visit to the station during which his
finger prints were taken.  (Stolinski Dep. 92:10-15.)  He cannot
recall who told him he must do so, he was free to leave, and he
denies ever having been arrested.  (<u>Id.</u>)


### E.  Grand Jury

Before the grand jury, Pennypacker testified about his
investigation.  He testified about the credit application which
American Express had alerted LG about, containing the name "G.
Stolins," an incorrect date of birth, and having LG's social
security number entered in both the social security number and
tax ID slots.  (Ex. B-1, Grand Jury Transcript, JP2431-2475, at
JP02440.)  He also testified at length about other credit
applications with incorrect information made by Stolinski.
Importantly, he told the grand jury about Stolinski's explanation

that he put his business tax ID in the wrong slot by mistake.
(Id. at JP02445.)  This revelation led to the logical follow-up
question from the Grand Jury regarding whether or not GS Tickets
existed and whether that was its real tax ID number.  (Id. at
JP02469-70.)  Consequently, DAG Kase recalled Pennypacker and had
the following exchange:

> Q: This was another question, do you know
> whether GS Tickets exists and has a tax ID
> number?
>
> A: Right.  We did a financial lookup on
> Sergeant Stolinski, and in April of '04 he
> registered himself as the president of GS
> Tickets.  GS Tickets'[s] registered business
> address is 407 Trescott Place, Mount Laurel,
> New Jersey.  Did that answer the question?
>
> Q:  Yes.  Does it have a tax ID number?
>
> A:  No.
>
> Q:  So, in the event a business does not have
> a tax ID number, what do they usually use?
>
> A:  Their Social Security number.

(Id. at JP02471.)

Plaintiff was indicted on July 15, 2005.  He was charged
with Fourth Degree Credit Card Fraud for "knowingly [making] or
[causing] to be made, either directly or indirectly . . . and
with the intent that it be relied upon . . . false statement[s]
in writing respecting his identity or financial condition . . .
with purpose to procure the issuance of a credit card from the
American Express Corporation" between May 16, 2004 and September

11

1, 2004.[5]  (Indictment at 3.)  This charge was supported by
Pennypacker's testimony regarding the evidence of applications
containing false names, birth dates, and other information,
including but not limited to the July 31, 2004 application
involving LG that was the initial cause of the investigation.
(Grand Jury Transcript at 2443-66.)  Stolinski was also charged
with Second Degree Official Misconduct for "purposely and
knowingly, while on duty and utilizing State of New Jersey
computer equipment, ma[king] online applications for American
Express credit cards using either a false name, date of birth,
social security number, and/or business identification number"
between July 31, 2004 and August 25, 2004.[6]  (Indictment at 1-2.)
Pennypacker testified that several of the applications containing
false information originated from Stolinski's computer at the
State Police office.  (Grand Jury Transcript at 2443-66.)
Finally, Stolinski was charged with Third Degree Identity Theft

---

[5]  See N.J. Stat. Ann. § 2C:21-6b ("A person who makes . . .
any false statement in writing, knowing it to be false and with
intent that it be relied on, respecting his identity or that of
any other person, firm or corporation, or his financial condition
or that of any other person, firm or corporation, for the purpose
of procuring the issuance of a credit card is guilty of a crime
of the fourth degree.").  A copy of the indictment can be found
at Defendant Pennypacker's Reply Exhibit 1.

[6]  See N.J. Stat. Ann. § 2C:30-2 ("[W]ith purpose to obtain
a benefit for himself . . . He commits an act relating to his
office but constituting an unauthorized exercise of his official
functions, knowing that such act is unauthorized or he is
committing such act in an unauthorized manner.").

for having obtained information of another to make the
applications.[7]  (Indictment at 4.)  Three days after he was
indicted, Plaintiff was suspended from work without pay.

### F.  Dismissal of Charges

On December 2, 2005, the prosecutor dismissed all of the
charges upon determining that Stolinski had been issued a tax ID
number corresponding to LG's social security number.  (Pl.'s Ex.
B-5, Supplemental Internal Investigation Report, JP03471-3511, at
JP03471-72.)  The reason for dismissing the charges unrelated to
obtaining LG's personal information is unclear; Pennypacker's
supplemental investigative report relates that DAG Kase "believed
the employer identification number was exculpatory evidence," but
does not explain why Kase thought the tax ID was exculpatory as
to the other counts of the indictment.  (Id. at JP3472.)  Indeed,
the employer identification number evidence was not necessary to
prove any other element of the remaining charges for credit card
fraud and official misconduct, discussed below.  Pennypacker was
reinstated to his position on January 5, 2006.

---

[7]  See N.J. Stat. Ann. § 2C:21-17a(4) ("Obtains any personal
identifying information pertaining to another person and uses
that information . . . in order to assume the identity of or
represent himself as another person, without that person's
authorization and with the purpose to fraudulently obtain or
attempt to obtain a benefit or services.")

### G.   Stolinski's Theory of Malice

Plaintiff claims that Defendant Koshland, acting as Pennypacker's supervisor, compelled Pennypacker to ignore the evidence regarding the tax ID number and lie to the Grand Jury. Plaintiff argues that Koshland was biased against him because of an alleged affair that Plaintiff's father had with Koshland's ex-wife, and that this bias led Koshland to induce Pennypacker to maliciously investigate and help prosecute Plaintiff.

Stolinski's father, William Stolinski Sr., avers that he engaged in an affair with Marriane Noakes from 1979 to 1985, including through part of the marriage between Ms. Noakes and Defenant Koshland from 1981 to 1991.  (Stolinski Sr. Decl. ¶ 5.) Ms. Noakes filed for divorce in August 1991.

The sole evidence that this alleged affair was known to Koshland is Stolinski Sr.'s speculation that, although he has never met Koshland, he believes "that he knew and knows of my relationship with Marianne Koshland."  (Stolinski Sr. Decl. ¶ 5.) The evidence that Koshland instructed Pennypacker to improperly investigate Stolinski's son in an inter-generational revenge plot is an e-mail in which Koshland indicates that creating a concrete investigation plan would make Pennypacker look good for those in charge of promotion (Pl.'s Opp. Br. Ex. E at 4); an email characterizing Pennypacker as "chomping at the bit" to complete his investigation of Stolinski (id. at 12); and the fact that

14

Pennypacker received a promotion in December 2005 (after the indictment was dismissed).

Koshland testified that he had heard the name Stolinski from his former wife, that she had "mentioned that name and many others troopers' names that used to work on the New Jersey Turnpike years back, in the seventies, I guess, that developed a friendship with her." (Koshland Dep. 52:2-53:1.)  Koshland denied knowing of any romantic relationship.  (Id. 58:5-60:18.) Koshland says Pennypacker was always eager in his investigations, (Id. 112:19-113:3), and that he did not promise him anything, nor did he have the authority to promise him anything related to the investigation (Id. 113:4-14.)

### H.  Expert Report of Edward Mamet

Plaintiff hired a retired NYPD Captain to write an expert report opining on whether the various aspects of Pennypacker's investigation were contrary to normal police procedure (Docket Item 93, Ex. A ("Mamet Report")).  Mr. Mamet opines that the transfer of the investigation from McNally to Pennypacker, the supervision of that investigation by Koshland, Pennypacker's failure to properly verify the tax ID number, the denial of permission for Pennypacker to interview Stolinski, and Pennypacker's subsequent investigation of Stolinski after the charges were dismissed were all improper police procedure.  Mr.

Mamet also opines that Pennypacker's behavior is indicative of his trying to get a promotion.

Defendants move to strike this report as mostly net opinion that fails to meet the requirements for expert testimony.  Since Plaintiff does not rely on the expert report in opposing summary judgment, and the Court finds that summary judgment is warranted for reasons discussed below, the Court does not reach the question of the expert report.[8]

## III.   SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact.  Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown,

---

[8]  In any case, Defendants correctly observe that Mamet's report is little more than personal speculation based on the assumptions Plaintiff asked him to make.

16

Pa., 2 F.3d 529, 533 (3d Cir. 1993).  However, the court will
view any evidence in favor of the nonmoving party and extend any
reasonable favorable inferences to be drawn from that evidence to
that party.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999).  Where
the nonmoving party bears the burden of persuasion at trial, the
moving party may be entitled to summary judgment merely by
showing that there is an absence of evidence to support an
essential element of the nonmoving party's case.  Fed. R. Civ. P.
56(c)(1)(B); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

### B.  Malicious Prosecution

To prevail on a malicious prosecution claim under New Jersey
law, a plaintiff must prove "(1) that the criminal action was
instituted by the defendant against the plaintiff, (2) that it
was actuated by malice, (3) that there was an absence of probable
cause for the proceeding, and (4) that it was terminated
favorably to the plaintiff." Epperson v. Wal-Mart Stores, Inc.,
862 A.2d 1156 (N.J. Super. Ct. App. Div. 2004) (citation
omitted).[9]  A plaintiff must also show that the conduct

---

[9]  Although Plaintiff brings two separate state law
malicious prosecution claims — one under the New Jersey
Constitution (Count V) and the other under the common law (Count
VI) — both parties discuss them as if they were a single claim
with the same elements.  This Court is not aware of any precedent
suggesting the proofs would differ in any way.  See Heck v.
Humphrey 512 U.S. 477, 483 (1994) (explaining that § 1983 claims
are based on common law torts); Chapman v. New Jersey, Civil No.

constituting institution of the action was the proximate cause of
the charges being brought (i.e., the chain of causation was not
interrupted by an intervening agent).  See Freeman v. State, 788
A.2d 867, 876 (N.J. Super. Ct. App. Div. 2002).  As this
causation aspect of the claim presents unsettled issues of New
Jersey law, and because the claim can be resolved based on the
other disputed elements, the Court does not reach the issue of
causation.[10]

### 1. <u>Malice</u>

Plaintiff's evidence of malice on the part of Defendants
consists of the claim that Pennypacker lied to the Grand Jury
regarding whether GS Tickets had a tax ID number matching LG's
social security number, that Pennypacker deliberately failed to

---

08-4130 (AET), 2009 WL 2634888 (N.J. Aug. 25, 2009) (explaining
that tort claims pursuant to the New Jersey Constitution are
mirrored on § 1983 claims).

[10] The question would be whether, under New Jersey law, the
testimony of a police officer as complaining witness can be used
to prove causation in light of both witness immunity and the
endorsement of the charges by the public prosecutor.  See Malley
v. Briggs, 475 U.S. 335, 340-46 (1986) (describing causation
requirement and witness immunity); <u>Curtis v. Bembenek</u>, 48 F.3d
281, 286 (7th Cir. 1995) (describing who is a complaining
witness); <u>White v. Frank</u>, 855 F.2d 956, 961-62 (2d Cir. 1988)
(explaining that witness immunity does not extend to complaining
witnesses).  <u>See also</u> Egan v. Holmes, L-4117-02, 2008 WL 238947,
at *4-5 (N.J. Super. Ct. App. Div. January 30, 2008) (recognizing
distinction between complaining witness and ordinary witness for
purposes of immunity); Palma v. Atlantic County, 53 F. Supp. 2d
743, 766 (D.N.J. 1999) (same).

properly verify the existence of the tax ID, and that Pennypacker
was motivated by a desire to get a promotion from Koshland who
wanted an against Stolinski because of the alleged affair between
Stolinski Sr. and Koshland's ex-wife.

Pennypacker was aware of Stolinski's claim that the number
matching LG's social security number was in fact his company's
tax ID.  And yet, Pennypacker's only attempt to verify this
critical fact was to examine a report that did not discuss the
tax ID number at all.  If Pennypacker understood the report to be
stating that GS Tickets had no tax ID number, there is not yet
any explanation for why his investigative report makes no mention
of this critical finding.  A reasonable jury could believe based
on the current record that Pennypacker either knew, or was
willfully blind to the fact that the tax ID number was
legitimate, and therefore lied to the Grand Jury.

However, the rest of Plaintiff's theory of malice is not
supported by evidence.  Unlike any number of other possible false
crimes, this is not a case where an officer's testimony might
actually result in conviction, since it would inevitably be
revealed that the tax ID number was legitimate.  Thus, Plaintiff
would have to convince a jury that Koshland hatched a revenge
plot involving having a subordinate lie about an easily
verifiable, objective fact that was certain to be revealed.  But
there is no admissible evidence from which a jury could find that

19

Koshland knew of the alleged affair between Stolinski Sr. and Ms. Noakes, and even if an inference of knowledge could be drawn from the bare fact of the affair, there is no evidence that Koshland bore any ill will toward Stolinski Sr.'s son because of the affair, much less took any action based on the affair. Pennypacker was ultimately promoted, but not until after the charges against Stolinski had been dismissed.  No reasonable jury could find that, based on the evidence in this record, Koshland, much less Hurley, played any role in Pennypacker's decisions regarding the tax ID or had any malice toward Stolinski.

While Pennypacker's questionable use of the FinCEN report and his grand jury testimony creates a dispute of material fact over Pennypacker's malice, Plaintiff has failed to adduce evidence showing that any of the other Defendants shared this mental state.  Without proof of actual malice on the part of the supervising officers, there can be no malicious prosecution claim under New Jersey law.  See N.J. Stat. Ann. § 59:3-8 (immunizing public employees from suit based on institution of judicial proceedings in the absence of actual malice); see also Hoag v. Brown, 935 A.2d 1218, 1230 (N.J. Super. Ct. App. Div. 2007) ("[W]ith respect to such intentional torts, the theory of respondeat superior does not apply.").

2.  Lack of Probable Cause

20

The other element of malicious prosecution in dispute is the requirement of a lack of probable cause.  As explained below, probable cause existed as to the official misconduct and credit card fraud charges, which means that Defendants are entitled to summary judgment.

### a. Probable Cause Defined

New Jersey courts define probable cause as "facts such as to lead a person of ordinary prudence to believe on reasonable grounds the truth of the charge at the time it was made." Brunson v. Affinity Fed. Credit, 972 A.2d 1112, 1121 (N.J. 2009); Camiolo v. State Farm Fire and Cas. Co., 334 F.3d 345, 363 (3d Cir. 2003).  The New Jersey Supreme Court has held that, at least in the context of the tort of malicious prosecution, a failure to investigate potentially relevant facts is irrelevant to the determination of whether the facts then in possession of investigators were a sufficient basis for probable cause. Brunson, 972 A.2d at 1121.

Probable cause is a sufficiently fact-laden issue as to typically be a question for the jury; however, summary judgment is appropriate, as with any other issue, if taking all of Plaintiff's allegations as true and resolving all inferences in his favor, a reasonable jury could not find in Plaintiff's favor. See Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998).

This can happen if the undisputed facts material to probable cause would mean that no reasonable jury could find a lack of probable cause, regardless of how the jury determined the disputed facts.

             b. Probable Cause as to Charges or Proceedings

     Both parties take the position in briefing and at oral argument that the question as to probable cause is whether Defendants had probable cause to believe Plaintiff was involved in criminal activity.  However, it is an open question whether a malicious prosecution claim must negate probable cause as to criminal activity generally, or whether there are circumstances in which a plaintiff need only show that some particular charge in a multi-count indictment was made without probable cause even when probable cause is present as to other charges simultaneously brought.  As explained below, New Jersey courts have not resolved that question, but even assuming that they would apply the approach in which under some circumstances a single illegitimate count provides the basis for a claim, they would not apply that approach in this case.  Thus, the Court reaches the same result whether it relies on the agreement between the parties as to the law or relies on its own examination of the precedent.

     The foundational New Jersey Supreme Court case explaining the common law tort of malicious prosecution speaks of "probable

cause to set the action in motion." Lind v. Schmid, 337 A.2d 365, 369 (N.J. 1975). The Court in Lind then goes on to state, "The plaintiff must demonstrate that at the time when the defendant put the proceedings in motion the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed. Was the state of facts such as to lead a person of ordinary prudence to believe on reasonable grounds the truth of the charge at the time it was made?" Id. This rule is perfectly clear in the context of a one-count indictment, but is muddier when one attempts to apply it to a multi-count indictment, given the tension between "believing that an offense had been committed" and "believ[ing] on reasonable grounds the truth of the charge." Id. One can believe some offense has been committed without necessarily believing that each charge is supported by reasonable grounds.

The federal courts' approach to this problem is instructive. For a § 1983 malicious prosecution claim in the Third Circuit, district courts are asked to carefully assess the factual context to determine whether the Plaintiff must show a lack of probable cause as to every count, or only as to one or more counts. See Kossler v. Crisanti, 564 F.3d 181, 193, 194 n. 8 (3d Cir. 2009). Where the defendant has played some direct role in bringing an additional, more onerous and illegitimate charge, it is then sensible to examine probable cause as to that particular charge.

Johnson v. Knorr, 477 F.3d 75, 82-84 (3d Cir. 2007).  When the
defendant took an action to institute proceedings generally, then
the question is, by analogy to false arrest, simply whether the
defendant had probable cause that any offense was committed.  See
Wright v. City of Philadelphia, 409 F.3d 595, 596-97 (3d Cir.
2005).

Though authority is split, the majority of jurisdictions
that have decided this question fall on the side of the fact-
sensitive approach as exemplified by the Third Circuit's approach
to § 1983 malicious prosecution, in which the facts of the
malicious prosecution claim are examined to determine whether a
lack of probable cause as to an individual count is a sufficient
basis for the claim.  See Johnson, 477 F.3d at 82; Posr v.
Doherty, 944 F.2d 91, 100 (2d Cir. 1991); DeLaurentis v. City of
New Haven, 597 A.2d 807 (Conn. 1991); McQueen v. City of
Indianapolis, 412 N.E.2d 138 (Ind. App. 1980); Singleton v.
Perry, 289 P.2d 794 (Cal. 1955); Boogher v. Bryant, 86 Mo. 42
(1885); Reed v. Taylor, 128 Eng.Rep. 472 (C.P. 1812). But see
Remeneski v. Klinakis, 473 S.E.2d 223 (Ga. App. 1996); Ruff v.
Eckerds Drugs, Inc., 220 S.E.2d 649, 651-52 (1975).

The question is which line of precedent New Jersey would
follow.[11]  Malicious prosecution is an avowedly disfavored tort

_____

[11]  The nature of the malicious prosecution tort in the
context of the modern criminal justice system involving public

24

in New Jersey.  See, e.g., Devlin v. Greiner, 371 A.2d 380, 393-94 (N.J. Super. Ct. Law Div. 1977).  The concern of the New Jersey courts is that such suits may chill the prosecution of legitimate claims.  Id.; see also Lind v. Schmid, 337 A.2d 365, 368 (N.J. 1975) ("It has generally been stated that malicious prosecution is not a favored cause of action because citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime."); Turner v. Wong, 832 A.2d 340, 349-50 (N.J. Super. Ct. App. Div. 2003) (same); Bauer v. Borough of Cliffside Park, 541 A.2d 719, 722 (N.J. Super. Ct. App. Div. 1988) (same); Westhoff v. Kerr S.S. Co., Inc., 530 A.2d 352, 356 (N.J. Super. Ct. App. Div. 1987) (same); Paul v. National Educ. Ass'n, 480 A.2d 213, 215 (N.J. Super. Ct. App. Div. 1984) (same).  This oft-expressed concern may make New Jersey courts reluctant to permit a malicious prosecution suit when most of the counts in a multi-count indictment are legitimate.  Given the difference in

---

prosecutors is that those individuals other than public prosecutors who are involved in bringing charges are rarely in control of the formal charges made in an ultimate indictment. Thus, in most cases, there is no need to distinguish between probable cause that some crime is committed and probable cause that particular crimes were committed because it is usually the public prosecutor who decides the particular crimes charged in an indictment.  It is the somewhat unusual case that a non-immune defendant has some role in framing the actual counts in a multi-count indictment in which there are distinct counts such that an individual may have probable cause as to one, but not all. Consequently, New Jersey courts have not yet directly addressed this question.

the significance of injury between one who would not be prosecuted at all but for the malicious accusation, and one who would still have been prosecuted but on the accompanying charges, it may be that New Jersey courts would side with the ranks of jurisdictions in finding that a malicious prosecution suit requires a wholly groundless indictment, rather than merely one groundless count.

This Court sitting in diversity need not make a definitive prediction, however, because, applying the fact-sensitive approach to this case shows that this case is not one that warrants examination of probable cause for each count, even if New Jersey courts were to apply that approach.  The paradigm case of when it makes sense to examine probable cause for an individual count is when an illegitimate and unrelated count carrying a higher penalty or causing greater reputational damage is maliciously added as a direct result of a defendant misleading the public prosecutor.  See Johnson, 477 F.3d at 84 (stating that the circumstances under which a count-by-count approach is necessary is when an officer "tack[s] on more serious, unfounded charges" which add an "additional burden" to a criminal defendant and where the officer directly misled the prosecutor); Posr, 944 F.2d at 100 (applying count-by-count approach where added counts were for more serious offenses).  Under this approach to the tort, the defendant responsible for maliciously adding a murder

26

count to a littering indictment by lying to the District Attorney
cannot take refuge in the fact that there was probable cause that
the accused littered.  Conversely, when the count lacking
probable cause is closely related to the other counts, and does
not carry a substantially greater penalty or cause greater
reputational damage, or where the defendant is less directly
involved in bringing the particular count in question, there is
less reason to adopt the count-by-count approach.  Thus, there
are two primary factors in determining whether to examine
probable cause for the proceeding generally or count-by-count:
(1) the level of involvement of the defendant in crafting the
charge, including the presence of intentional misrepresentation
to the public prosecutor; and (2) the effect of the additional
charge on the accused (i.e., whether it is more serious, involves
substantially different facts, and imposes a greater burden on
the accused).

In this case, the facts weigh against application of the
count-by-count approach.  First, as distinct from the evidence
that Pennypacker misled the grand jury, there is no evidence that
Pennypacker misled or manipulated DAG Kase.  It was DAG Kase's
responsibility to recognize that the investigation had revealed
no evidence that Stolinski had some way of accessing LG's
personal information, and that nothing in the investigation
report showed that the tax ID story had been discredited, but she

27

elected to bring the charges anyway.  Perhaps, since this
identity theft crime had been added to the statute only a few
year previous in 1999, DAG Kase failed to appreciate that
entering a nine-digit number which is likely to match another
individual's social security number may be an effective strategy
for fraud, but it does not satisfy the statutory language.  1999
NJ Sess. Law Serv. Ch. 117.

Second, the crime charged is closely related to the other
charges: the difference between two different kinds of fraud is
much less than the difference between disorderly conduct and
violence, Posr, 944 F.2d at 100, or the difference between
threats and actual violence.  See Johnson, 477 F.3d at 84.  And,
in this case, the additional count would not have placed
substantial additional burdens on the accused to defend the
charges he was already facing.  Third degree identity theft is a
lesser crime than second degree official misconduct, and there
was no chance of conviction or additional burden created by the
charge — after the indictment, Stolinski simply produced proof
that he did have the tax ID number in question.  Since the
identity theft charge was neither different in kind nor more
severe than the other charges, and since in any case it did not
increase Plaintiff's burden to defend the matter or present a
threat of incarceration, these facts present a very weak case for
the count-by-count approach to probable cause.  Therefore, even

if there are malicious prosecution cases in which New Jersey
Courts would examine an indictment count-by-count, this is not
such a case.

Consequently, under the present circumstances, the presence
of probable cause as to any significant offense charged in the
multi-count indictment will be sufficient to defeat a claim for
malicious prosecution upon any of the charged offenses.

### c.  Existence of Probable Cause

A reasonable jury could find that Pennypacker lacked
probable cause as to the identity theft charge.  The only
evidence suggesting that Stolinski obtained LG's private
information is that Stolinski entered a number on credit
applications matching LG's social security number.  In the
absence of other facts known to an investigator, this would
likely constitute probable cause for identity theft, even though
Stolinski did not enter any other information matching LG's
identity.  But in this case, Pennypacker was aware of Stolinski's
claim that these numbers were also the tax ID issued to his
business (as evidenced by, among other things, his purported
verification of the number).  A reasonable jury could find that
the facts known to Pennypacker at the time did not warrant a
prudent officer in believing that Stolinski had committed
identity theft.  In the absence of any suggestion of how it was

that Stolinski would have obtained the information from an elderly man in Arizona, and in the absence of any other information related to LG entered on the form, and in the presence of the explanation offered by Stolinski that the number was the tax ID for a business he did actually own, a jury could find that there was no probable cause for identity theft.

However, no reasonable jury could find that Pennypacker lacked probable cause to believe credit card fraud and official misconduct had occurred.  Credit card fraud requires only that a person make a false statement respecting his identity or financial condition knowing it to be false and with intent that it be relied on by the potential creditor.  <u>See</u> N.J. Stat. Ann. § 2C:21-6b.  As a matter of law, based on the undisputed facts, a reasonably prudent officer could conclude that the magnitude and nature of the pervasive pattern of material errors on the credit applications submitted by Stolinski, along with the other circumstances of this case such as his bleak financial situation, were evidence of a deliberate scheme to obtain credit under a false identity or based on fraudulent financial information while maintaining plausible deniability.[12]  <u>See, e.g.</u>, <u>United States v.</u>

_____

[12]  The prosecution memo outlines how Stolinski submitted six false credit card applications while on duty, and several more from home, using false names (i.e., Stolinki, Stolins, Stolinsk), false birth dates (usually by inverting two of the digits), and false social security numbers.  (Prosecution Memo at JP129.)  In his deposition for this action, Stolinski admitted

<u>Nichols</u>, 229 F.3d 975, 978 (10th Cir. 2000) (describing a similar scheme).  This probable cause is entirely independent from whether Stolinski obtained LG's social security number. Similarly, the official misconduct charge was based on the credit fraud having been performed on state computers, which is not disputed, as to which probable cause also undeniably existed for indictment under N.J. Stat. Ann. § 2C:30-2, <u>supra</u>.

　　As discussed above, in this case it is sufficient that Defendants identify probable cause as to any comparably significant or more significant offense in the indictment to defeat a claim for malicious prosecution.  Here, the facts demonstrate that there was probable cause to indict Stolinski for the significant and related charges of credit card fraud and official misconduct, the latter of which carried a maximum penalty greater than the identity theft count.  Stated differently, the single charge on which probable cause was absent was not the most significant charge in this multi-count indictment; Stolinski legitimately was called upon to defend against this indictment.  Defendants are therefore entitled to summary judgment because probable cause existed for counts other than identity theft.

---

the repeated alterations in his own name, entering of incorrect income amounts, and listing his own year of birth incorrectly ten times. (Stolinski Dep. 54:13-22, 69:10-13, 70:11-15.)

d.  Relevance of Malice to Probable Cause

Plaintiff argues that proof that Pennypacker misled the grand jury is itself proof of a general lack of probable cause. This argument rests on a false legal premise, namely, that there is a relationship between subjective beliefs and probable cause.

At common law, a plaintiff could "show the lack of probable cause either by showing that the actual facts did not amount to probable cause (an objective inquiry) or by showing that the defendant lacked a sincere belief that probable cause existed (a subjective inquiry)." Wyatt v. Cole, 504 U.S. 158, 178 n.2 (1992); see Restatement (Second) Torts, § 662 cmt. c (1965) ("A private prosecutor can not have probable cause for initiating criminal proceedings against another if he does not believe that the accused was guilty of the crime charged against him."). However, contemporary constitutional jurisprudence has interpreted probable cause to be an objective inquiry such that "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004).  This is partly based on the Fourth Amendment's keystone of reasonableness, which is an objective inquiry.  Id.; see also Whren v. United States, 517 U.S. 806, 811-12 (1996).  Thus, malice would be relevant to probable cause only if the use of the term probable cause in the common law malicious prosecution tort tracked the older,

32

subjective definition of probable cause, instead of the modern
objective definition.

Three considerations counsel for the use of objective
probable cause.  First, if a malicious prosecution claim turned
solely on the subjective beliefs of the defendant, then there
would be no objective standard which an official could meet to
insulate himself from such suit; consequently, many cases would
be a matter of the credibility of the testimony of the official
who instituted the proceedings about their subjective mental
state, increasing the chilling effect of such malicious
prosecution suits.  See Lind v. Schmid, 337 A.2d at 368
(expressing concern over the possibility of chilling legitimate
prosecutions).  By contrast, the requirement of a lack of
objective probable cause creates a sanctuary in which those
involved in bringing criminal actions can take refuge from
maligned criminal defendants.

Second, the requirement of objective probable cause acts as
a test for whether damage was actually caused by the malicious
prosecution.  If there is objective probable cause, the suit
could legitimately have been brought whether there was malice or
not.  But if objective probable cause is lacking, proof of malice
becomes a much stronger showing that in the absence of such
malice the malicious prosecution plaintiff would have been
unharmed.  Finally, it would be odd if the element of probable

33

cause served the purpose of describing a particular mental state or intentionality that must be present in the mind of the defendant, since there is already a requirement of actual malice. Lack of probable cause would virtually cease to be an independent element if lack of subjective belief in guilt were sufficient, as that mental state will nearly inevitably accompany charges brought maliciously.

Unfortunately, the purpose of the requirement of lack of probable cause has long since ceased to be discussed in the precedent, making it more difficult to determine for what purposes New Jersey courts apply this element of the tort. However, New Jersey Courts have consistently used the language of objective probable cause when describing the tort of malicious prosecution. See, e.g., LoBiondo v. Schwartz, 970 A.2d 1007, 1024 (N.J. 2009) (equating probable cause in the context of malicious prosecution with ordinary criminal law probable cause, as distinct from probable cause in the malicious use of process tort); Brunson, 972 A.2d at 1121. And New Jersey Courts have also rejected other common law aspects of the probable cause element of malicious prosecution. Compare Restatement (Second) of Torts § 662 cmt j (1977) with Brunson, 972 A.2d at 1121 (holding that failure to investigate is irrelevant to probable cause). Given the complete absence of New Jersey law suggesting a divergence between its approach to probable cause in the

context of common law malicious prosecution claims and its approach to probable cause in criminal law, this Court finds that the New Jersey tort uses the objective definition of probable cause.  Consequently, even if proof that Pennypacker deliberately misled the grand jury constitutes proof that Pennypacker doubted the validity of all the charges, this is logically irrelevant to probable cause.[13]

Plaintiff relies on Peterson v. Bernardi, 719 F. Supp. 2d 419 (D.N.J. 2010), for the proposition that the presence of malicious fabrication of evidence can permit a reasonable jury to conclude that the officers proceeded without probable cause.  Peterson, however, conflates the presumption of probable cause with actual probable cause.   In Peterson, the Court relied on precedent stating that malice in the form of fabricating evidence or lying overcomes the presumption of probable cause which arises when an indictment issues.  Id. at 428.  The reason malice rebuts that evidentiary presumption in those cases is that an indictment tainted by false evidence does not warrant an inference that it must have been procured based on probable cause.  See, e.g., Hinchman v. Moore, 312 F.3d 198 (6th Cir. 2002).  But Peterson did not identify any precedent or offer any explanation for the

_____

[13]   Even if the common law definition of probable cause still applied in New Jersey, it is unclear whether malice as to one count in a multi-count indictment would be sufficient to undermine probable cause as to the other counts.

rather different proposition that such malice undermines actual evidence supporting probable cause, as distinct from an evidentiary presumption.

Unlike the case in which fabricated evidence undermines reliance on an indictment, fabricated evidence is logically irrelevant to whether undisputed real evidence creates probable cause in the modern constitutional sense.[14]  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Id. (citing Maryland v. Pringle, 540 U.S. 366, 371 (2003)).  Whether an officer fabricates evidence or believes he has probable cause is irrelevant to the objective inquiry of whether a prudent officer would reasonably believe, based on the non-fabricated evidence, that the defendant committed the crime.

Therefore, even if a reasonable jury could find that lying

_____

[14]  The Court in Peterson also discussed the application of malice to negate probable cause in the qualified immunity context of what a reasonable officer would believe about the law, acknowledging "the counterintuitive possibility that an officer believing in the presence of probable cause could nonetheless fabricate evidence to further strengthen an already strong prosecutorial case," but deciding that "the doctrine of qualified immunity must not be expanded to absolve objectively bad actors." Id. at 429 n.8.  This reasoning might be correct in the narrow context of whether an officer who lacked actual probable cause might nevertheless be protected by qualified immunity, because qualified immunity aims to protect officers acting in good faith. But, for the reasons given above, this reasoning cannot be expanded to the question of whether probable cause was actually lacking when it is already present in the undisputed evidence as in this case.

about the identity theft count also casts doubt on Pennypacker's
subjective belief in Stolinski's guilt on the other charges, this
would not be a sufficient basis for concluding that Pennypacker
lacked probable cause as to those other charges.

### C.  Abuse of Process

To establish a claim for abuse of process, Plaintiff must
show: "1) an ulterior motive and 2) some further act after an
issuance of process representing the perversion of the legitimate
use of process."  See Mosley v. Delaware River Port Authority,
J.P., No. 99-4147, 2000 WL 1534743, at *9 (D.N.J. Aug. 7, 2000)
(applying New Jersey law).  "A successful claim of malicious
abuse of process . . . requires a defendant's improper,
unwarranted and perverted use of process after it has been
issued."  Wozniak v. Pennella, 862 A.2d 539, 549 (N.J. Super. Ct.
App. Div. 2004) (internal quotation omitted).  The "process" that
must have been abused "includes the 'summons, mandate, or writ
used by a court to compel the appearance of the defendant in a
legal action or compliance with its orders.'"  Id. (quoting
Ruberton v. Gabage, 654 A.2d 1002, 1005 (N.J. Super. Ct. App.
Div. 1995).  The typical abuse of process claim involves
leveraging some attachment process or complaint in order to
achieve some other end.  See, e.g., Wozniak, 862 A.2d 539
(addressing claim that a landlord filed a criminal complaint

against a tenant, and then attempted to use the criminal complaint as leverage to induce the tenant to withdraw his pending civil action against the landlord).

Plaintiff explains that this claim is based on Pennypacker's continued investigation and pursuit of a federal indictment after the state indictment was dismissed, and the fact that Pennypacker "continued to access Sgt. Stolinski's mail, through use of a 'Mail Cover' subsequent to the indictment." (Pl.'s Opp. Br. 31.) The continued investigation and pursuit of federal indictment do not constitute abuse of process because it involves no use of process, as that term is understood in New Jersey law. See Ruberton, 654 A.2d at 1005 (explaining that abuse of process requires application of judicial power to achieve improper ends); Tedards v. Auty, 557 A.2d 1030, 1035 (N.J. Super. Ct. App. Div. 1989) (same).

Mail cover "is the process by which a nonconsensual record is made of any data appearing on the outside cover of any sealed or unsealed class of mail matter, or by which a record is made of the contents of any unsealed class of mail matter as allowed by law, to obtain information" for various law enforcement purposes. See 39 C.F.R. § 233.3; Paton v. La Prade, 469 F. Supp. 773, 776 (D.N.J. 1978). A law enforcement officer can apply for mail cover of a suspect by following the process outlined in the postal regulations. It is not available as the result of any

38

judicial order or process (in part because the information on the outside of an envelope is not private), and therefore is not process for the purposes of the abuse of process tort.  See Ruberton, 654 A.2d at 1005 (explaining that abuse of process requires the illegitimate use of judicial power).

In addition to the fact that the processes alleged to have been abused do not fall within New Jersey's abuse of process tort, Plaintiff does not adduce any evidence or present any argument that Pennypacker's activities were a "perversion of the legitimate use of process" (i.e., that his activities exceeded the scope of what was reasonably necessary to continue to investigate objectively reasonable concerns about Stolinski's false applications), as required by New Jersey law.  Mosley, 2000 WL 1534743, at *9.  Defendants will therefore be granted summary judgment as to this claim.

### D.  § 1983 False Arrest

To prove a claim for false arrest, a plaintiff must prove two elements: (1) that there was an arrest; and (2) that the arrest was made without probable cause.  Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).  Plaintiff has not adduced evidence for either element.  Plaintiff has only shown that he was required to go to the police station for finger printing, and in any case, Defendants had probable cause to

believe Plaintiff had committed multiple felonies even if this processing constituted an arrest.  Defendants will therefore be granted summary judgment as to this claim.

### E.   § 1983 Conspiracy

In order to prove a cause of action for civil conspiracy under § 1983, a plaintiff must adduce evidence of both the elements of cause of action under § 1983 and conspiracy.  <u>See</u> <u>Marchese v. Umstead</u>, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000).  Proof of conspiracy requires a showing that two or more co-conspirators reached an agreement for the purpose of depriving constitutional rights under color of state law.  <u>Parkway Garage,</u> <u>Inc. v. City of Phila.</u>, 5 F.3d 685, 700 (3d Cir. 1993).  Plaintiff produces no evidence to show an agreement between the parties to do anything unlawful, nor is there any underlying deprivation of rights protected by § 1983 as all other claims have been dismissed.  Defendants will therefore be granted summary judgment as to this claim.[15]

### F.   False Light Tort

The tort of false light requires a showing that "the false light in which the other was placed would be highly offensive to a reasonable person" and "the actor had knowledge of or acted in

---

[15]  Because the Court finds that Defendants are entitled to summary judgment on all of Plaintiff's federal claims even without qualified immunity, it need not address whether qualified immunity would otherwise apply.

reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Leang v. Jersey City Bd. of Educ., 969 A.2d 1097, 1116 (N.J. 2009) (quoting Restatement (Second) of Torts, § 652E).  Plaintiff fails to adduce sufficient evidence to support his claim in four independent ways.  First, in support of his claim, Plaintiff simply attaches a number of newspaper articles, but does not identify the particular statements he believes constitute torts. Second, as far as the Court can tell, the articles are truthful; they state that Stolinski had been charged with various crimes, a true fact that was a matter of public record.  Third, each of the attached articles either does not include a date, or includes a date which is not within the 90 days from the time of the filing of a notice of tort claim for which this Court previously held that Plaintiff has actionable claims [Docket Item 45 at 7].  And fourth, Plaintiff adduces no record support for the proposition that any of Defendants was involved in publicizing the information.  For all of these reasons, Defendants will be granted summary judgment as to this claim.

### G.  Invasion of Seclusion Tort

This tort "imposes liability on 'one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person.'" Leang, 969 A.2d at 1115 (N.J. 2009) (quoting Restatement (Second)

of Torts, § 652B (1977)).  Plaintiff maintains that the various official requests for records and information made during the course of Pennypacker's investigation constitute an invasion of his privacy.  First, as with his false light claim, Plaintiff fails to identify any particular act that invaded his privacy. Second, Plaintiff does not point to any precedent supporting the applicability of this tort to official requests for information, or explain why it should so apply.  No reasonable person would find a request for information issued with probable cause to be highly offensive, and therefore such a request cannot form the basis for an invasion of privacy tort.  Defendants will therefore be granted summary judgment as to this claim.

## V.  CONCLUSION

The only claim approaching viability in this case is Plaintiff's malicious prosecution claim.  But since probable cause existed to bring the credit card fraud and official misconduct charges, the possibly improper addition of the identity theft charge is an insufficient basis for a malicious prosecution suit under New Jersey law.  Defendants' motions for summary judgment will likewise be granted on the remaining claims for abuse of process, § 1983 false arrest, § 1983 conspiracy, the tort of false light, and invasion of seclusion.  Since Defendants are therefore entitled to summary judgment as to all claims, the motion to strike Plaintiff's expert will be dismissed as moot.

The accompanying Order will be entered.


**February 16, 2011**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         United States District Judge

43